Milton Shalleck, J.
Plaintiff obtained a judgment against defendant by default on September 14, 1964, in Great Britain. It was granted by the High Court of Justice, Queens Bench Division. The present action is to recover the amount of said judgment.
Defendant’s answer sets up: (1) that the English court lacked jurisdiction over defendant, and (2) a denial of the allegations now of the substance of the English court statement of claim.
On the assertion that there is no triable issue of fact, plaintiff moves for summary judgment (CPLR 3211, subd. [b]; CPLR 3212), contending that there is no defense to the present cause of action.
The controversy arises from the following situation: Defendant, a New York corporation, appointed plaintiff its exclusive concessionaire in the United Kingdom to sell defendant’s manufactured product — a battery additive known as VX-6 — by agreement dated December 5, 1960, to which there was a Canadian third-party supplier signatory. By paragraph 9 thereof the agreement was “ in all respects [to] be interpreted in accordance with the law of England ’ ’; and by the last paragraph the “ covenants * * * on the part of the Supplier and the Manufacturer ” were to be “ separate and several ”,
In the English action it was alleged in the statement of claim (the counterpart of a complaint here) that “By a collateral oral agreement ” made in March, 1961 in New York, defendant was to provide in a London bonded warehouse “ a floating stock of about 20,000 units of the said VX-6 product” upon which plaintiff could draw as needed, concerning which plaintiff was to deposit with defendant’s agent in London, the American Express Company, Inc., 20% of each unit’s purchase price. It was further alleged that said deposit was to be “a token of # good faith ”, with the implication “that the said deposit would be returned * * * if no such orders were ]Raced by them.” Thereafter, 10,000 units were placed in the warehouse and equivalent deposits made in May, 1961. At the time of the cessation of trading under the agreement — *915 December, 1962 — £606 12/ 5d was the remaining deposit on the unused stocks, to which plaintiff laid claim under the aforesaid collateral oral agreement. A demand therefor was ignored and suit followed.
The writ of summons and accompanying statement of claim were admittedly personally served upon the defendant in New York City on August 18, 1964. Such service outside the jurisdiction was made pursuant to a permissive order of the High Court of Justice issued on August 11,1964 under Order 11, rule 1(f)iii and (g) of the Supreme Court of Judicature. The defendant had 21 days to appear, but did not. Judgment ensued. According to plaintiff’s expert, judicially noticed under CPLR 4511 (subd. [b]), and here unrebutted, the facts of this case are of sufficient jurisdictional basis for the application of Order 11. The pertinent provisions of Order 11 are:
‘ ‘ service of * * * notice of a writ out of the jurisdiction is permissible with the leave of the Court in the following cases, that is to say:— * * *
“ (f) if the action begun by the writ is brought against a defendant not domiciled or ordinarily resident in Scotland to enforce, rescind, dissolve, annul or otherwise affect a contract, or to recover damages or obtain other relief in respect of the breach of a contract, being (in either case) a contract which:— * * *
“ (iii) is by its terms, or by implication, governed by English law * * *
“ (g) if the action begun by the writ is brought against a defendant not domiciled or ordinarly resident in Scotland or Northern Ireland, in respect of a breach committed within the jurisdiction of a contract made within or out of the jurisdiction, and irrespective of the fact, if such be the case, that the breach was preceded or accompanied by a breach committed out of the jurisdiction that rendered impossible the performance of so much of the contract as ought to have been performed within the jurisdiction ’
The default was a deliberate one. Defendant “ ignored the process ”. No appearance was admittedly made “ upon advice of counsel” that the English court did not have jurisdiction over defendant. But is that ground factually and legally so? I think not, despite defendant’s reliance on, and the holdings in, Ross v. Ostrander (192 Misc. 140) and Grubel v. Nassauer (210 N. Y. 149).
In Ross, Judge Pécora, quite authoritatively in 1948, stated -that New York was “not required” to give to a judgment obtained in England under the aforesaid rule (Order 11) *916 “ recognition unless the requirements of jurisdiction according to the laws of this forum are met ” (p. 142). Nor is there cavil with the Court of Appeals holding in Grubel, which denied extraterritorial effect to a default judgment obtained without personal service upon defendant in Germany, for the court undoubtedly, among others, relied upon Pennover v. Neff (95 U. S. 714) which was also good law for many, many years.
But as times change, so do laws and court holdings. Legal progress must be attuned to the times currently or justice stagnates. The logical results from clear legal pronouncements in the earlier cases must give way to modern legal thought. Gilbert v. Burnstine (255 N. Y. 348) was a forerunner of change as applied to the instant problem. The court denied general ‘ ‘ extraterritorial jurisdiction of alien tribunals ’ ’ but held that where one of our citizens “ agrees to be bound by * * * service ” issued therefrom, it “ should, in the absence of potent objection, be enforced * * *. Courts should endeavor to keep the law at a grade at least as high as the standards of ordinary ethics * * * [thus] Vigor has been infused into process otherwise impotent ” (pp. 354-355).
In September, 1963, CPLR 302 and section 404 of the CCA became effective. It gave a new approach to in personam jurisdiction. The entire New York law on this subject was changed. These provisions made a nonresident of New York subject to our jurisdiction when a “ single act ” took place in this State. The transacting of any business in New York; the committing of a tortious act in New York; the owning, using or possessing of any real property located in New York — each constituted the “single act” within the statutes’ purview and each gave personal jurisdiction over nondomiciliaries, although the latter were served elsewhere than in New York (CPLR 313). This became the new public policy of the State with respect to personal jurisdiction. It complied with the legal requirements laid down by the United States Supreme Court (International Shoe Co. v. State of Washington, 326 U. S. 310) which held that “ due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend ‘ traditional notions of fair play and substantial justice ’ ” (p. 316). It was this very case which led the Avay for the enactment of “ single act” statutes in Illinois, this, and other States.
If there Avere any doubts as to this modern turn of the law, they were short-lived. McGee v. International Life Ins. Co. (355 U. S. 220) put their value to rest at their nadir forever. McGee *917 held that “ single-act ” statutes were “ remedial they affected none of the rights or obligations under a contract, substantively. What they did do was to provide a “ forum to enforce ” those substantive rights (p. 224).
Thus Boss is definitely no longer good New York law. Gruber, which was bottomed on Pevmover, is of doubtful worth in New York since McGee practically overruled Pennover. (See Schneider v. J & G Carpet Co., 23 A D 2d 103; Longines-Wittnauer v. Barnes & Reinecke, 15 N Y 2d 443.)
Remaining is the question of retroactivity of our “single act ” statute.
In Longines-Wittnauer (supra) and in Simonson v. International Bank (14 N Y 2d 281) CPLR 302 was held to embrace suits instituted after it became effective but based upon previously accrued causes of action. I am precluded from a legal finding otherwise here under the time factors of this controversy, since they are analogous.
Thus we are left with the conclusiveness on the merits of the English judgment of September 14, 1964 (Dunstan v. Higgins, 138 N. Y. 70, 74) unless it could be impeached by the arguments of defendant as to lack of jurisdiction or by proof of its having been procured by fraud (see Johnston v. Compagnie Generale Transatlantique, 242 N. Y. 381; Cowans v. Ticonderoga Pulp & Paper Co., 219 App. Div. 120, 121-122, affd. 246 N.Y. 603; Neporany v. Kir, 5 A D 2d 438). Neither is available to defendant, the former by reason of the present state of the law as to personal jurisdiction and the latter as inapplicable.
Under the circumstances, defendant was unjustified in a purposeful nonappearance in the English suit. It had alternatives. It should have taken advantage of Order 12, rule 7 (1) of the Rules of the Supreme Court of Judicature by entering a conditional appearance by leave of the court in order to prevent a judgment by default against it and then under rule 9 (1) of said rules should have moved to set aside service on the ground of lack of jurisdiction, if it was so advised, or it should have appeared generally in the English suit and defended then on the merits. It is far too late to defend now by asserting any substantive allegations in opposition to the claim in main. If the facts were the reverse, this court would have taken jurisdiction of the English defendant by extraterritorial service under our statutes. We can do no less now in affording the English court reciprocal acquisition of jurisdiction over the defendant here. It has the support of our present public policy.
*918 From the foregoing, I conclude and hold that defendant was subject to the jurisdiction of the English court (see National Rental v. Szukhent, 375 U. S. 311, 316); that the English judgment was conclusive (cf. Prosperity Co. v. American Laundry Mach. Co., 271 App. Div. 622, affd. 297 N. Y. 486), and that defendant has no meritorious defense to this action. Accordingly the motion is granted.