**NIPPON EMO–TRANS CO., LTD., Plaintiff,**

v.

**EMO–TRANS, INC., Defendant.**

**No. CV–90–416 (RJD).**

United States District Court, E.D. New York.

Sept. 14, 1990.

---

George J. Grumbach, Jr., John Palenberg, Daniel J.H. Greenwood, Cleary, Gottlieb, Steen & Hamilton, New York City, for plaintiff.

James V. Ryan, Jonathan A. Schorr, Rogers & Wells, New York City, for defendant.

## MEMORANDUM AND ORDER

DEARIE, District Judge.

In this action, plaintiff, Nippon Emo–Trans Co., Ltd. ("NET"), seeks recognition of a judgment it obtained against defendant, Emo–Trans, Inc. ("ETI"), in the Tokyo District Court of Japan. Currently before the Court are (i) NET's motion to confirm an attachment pursuant to Sections 6211 and 6212 of the New York Civil Practice Law and Rules, N.Y.Civ.Prac.Law & R. §§ 6211, 6212 (McKinney 1980) and (ii) ETI's cross-motion to vacate or modify the attachment and to stay this action pursuant to Section 5306 of the New York Civil Practice Law and Rules, N.Y.Civ.Prac.Law & R. § 5306 (McKinney 1978).

## BACKGROUND

NET is a Japanese corporation with its principal operations in Japan; ETI is a New York corporation with its principal place of business in New York City. Since the Court's jurisdiction is based on diversity of citizenship, this action is governed by New York law, including New York principles of conflict of laws. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

NET and ETI are freight forwarders; their business involves assembling goods from various sources for shipment, arranging shipment, and arranging to have the shipments broken down and delivered to the ultimate recipient. Between August 1982 and February 1986, NET and ETI had a contractual relationship pursuant to which each would act as the receiving end for shipments assembled by the other. At

1218

some point in 1985, a dispute arose as to the allocation of profits between the two companies in connection with freight charges collected from consignees. NET claimed that ETI had failed to remit approximately $354,000 due to NET. ETI claimed that NET's calculation was based on a misinterpretation of the contract.

In June 1986, NET filed an action (the "Japanese Action") in the District Court of Tokyo (the "Tokyo Court"), seeking to recover the money it claimed was owing from ETI. In April 1988, ETI filed a parallel action in this court entitled *Emo Trans, Inc. v. Nippon Emo–Trans Co., Ltd.*, CV–88–1332 (RJD); that action was stayed pending the outcome of the Japanese Action. In the Japanese Action, ETI initially contested the Tokyo Court's jurisdiction over it; that Court ruled on December 8, 1988, that it had personal jurisdiction over ETI. Thereafter, ETI appeared and defended in Japan. A trial was conducted, and on November 14, 1989, the Tokyo Court issued a decision awarding NET $51,-331,204 (approximately $354,000) plus interest and costs (the "Japanese Judgment"). On November 28, 1989, ETI filed an appeal with the Tokyo High Court; that appeal is pending.

On February 1, 1990, NET commenced the present action by filing an application for an *ex parte* order of attachment which would permit it to attach any property of ETI found in New York, up to a limit of $400,000. The application was granted and the order of attachment was signed on February 2, 1990.[1] In accordance with New York law, NET was required to make a motion to confirm the attachment within five days after levy was first made.[2] Notices of levy were served on various banks and on the Queens County Clerk on February 5, 1990; NET timely moved to confirm the attachment on February 9, 1990.

In order to prevail on the motion to confirm, NET must show (i) that there is a cause of action, (ii) that it is probable that NET will succeed on the merits, (iii) that one or more grounds for attachment exist, (iv) that the amount demanded from ETI exceeds all counterclaims known to NET, and (v) the need for continuing the levy.[3]

In this case, the question whether to confirm the attachment turns on two issues. The first is whether the Tokyo Court had *in personam* jurisdiction over ETI. If so, then a cause of action arises under New York's version of the Uniform Foreign Money–Judgments Recognition Act, N.Y. Civ.Prac.Law & R. §§ 5301–5309 ("Article 53"), NET will probably succeed on the merits (barring a reversal on appeal in Japan), and the Japanese Judgment would provide a basis for the attachment. The second issue is whether there is a need to continue the attachment. ETI argues that because it is a substantial company with unencumbered assets far in excess of the judgment, no such need can be established; NET responds that the fact that the Japanese Judgment remains unsatisfied is sufficient to establish a need to continue the attachment. With regard to the sole remaining criterion on the motion to confirm, NET asserts that the amount claimed exceeds any known counterclaims; other than pointing out that its appeal of the Tokyo Court's decision has not yet been decided, ETI does not seriously contest this assertion.

JURISDICTION OF THE TOKYO COURT

ETI asserts that the Tokyo Court did not have *in personam* jurisdiction over it, and that as a result, Section 5304(a)(2) precludes recognition of the Japanese Judgment. ETI argues that (i) because it has preserved its jurisdictional objection in Japan, it did not "voluntarily appear" in Japan within the meaning of Section

1. Section 6201(4) of the C.P.L.R. permits the granting of an order of attachment when
 the cause of action is based on a judgment, decree or order of a court of the United States or of any other court which is entitled to full faith and credit in this state, or on a judgment which qualifies for recognition under the provisions of article 53.

N.Y.Civ.Prac.Law & R. § 6201(4) (McKinney 1980).

2. N.Y.Civ.Prac.Law & R. § 6211(b) (McKinney 1980).

3. N.Y.Civ.Prac.Law & R. §§ 6212(a), 6223(b) (McKinney 1980).

5305(a)(2); (ii) none of the other bases of jurisdiction described in Article 53 is applicable in this case; and (iii) the Tokyo Court found that it had jurisdiction on the basis of principles which do not warrant recognition under Article 53. NET responds that ETI has misinterpreted Japanese law; it argues further that by defending on the merits, ETI has, under Article 53, foregone any right to claim that the Tokyo Court did not have jurisdiction. In addition, it asserts that New York courts will recognize the jurisdiction of foreign courts on any basis under which they themselves would be permitted to take jurisdiction. Finally, NET claims that even under more conservative standards, the Tokyo Court could properly have taken jurisdiction.

### A. Background of Article 53

New York had a long-standing liberal tradition regarding recognition of foreign country judgments prior to the passage of Article 53. In the late 1960's, the Judicial Conference of the State of New York commissioned Professor Barbara Kulzer to conduct a study on the desirability of enacting the Uniform Foreign Money–Judgments Recognition Act (the "Uniform Act"); Professor Kulzer generally supported passage of the Uniform Act, while recommending minor changes to bring the statute closer to New York caselaw.[4]

In 1970, when the Uniform Act was enacted as Article 53, a brief commentary on the bill was included in the *New York State Legislative Annual—1970*. The commentary indicated that its primary purpose was "to procure for New York judgments in foreign countries much better reciprocal treatment at the hands of foreign courts than they now receive." *Id.* at 10. It indicated further that the legislation was intended to "incorporate [the Uniform Act] in New York law." The commentary explicitly recognized that the Uniform Act

mandated recognition of foreign judgments "at a level below that presently accorded to them by New York courts," but indicated that "New York courts will be free to exceed Article 53 in liberality if they so choose." *Id.* The commentary did not discuss particulars of the legislation. It did, however, specifically reference Professor Kulzer's report; thus in cases where fine points of interpretation are called for, it is appropriate to look to Professor Kulzer's work as well as any clarifications which can be drawn from the history of the Uniform Act itself. Since its passage, Article 53 "has received 'scant judicial attention.'" D. Siegel, *Practice Commentaries* C5301:1, N.Y.Civ.Prac.Law & R. § 5301 (McKinney's 1978) at 486.

### B. "Voluntary Appearance"

■ Although ETI lost its jurisdictional challenge in the Tokyo Court and was ordered to proceed on the merits, it has preserved its jurisdictional objection on appeal in Japan. ETI contends that under Japanese Law it is not deemed to have voluntarily appeared, and thus cannot be precluded from raising the jurisdictional issue here under Section 5305(a)(2). NET argues that it is error under Japanese law to equate the notion of preserving an objection on appeal with that of involuntary appearance. The parties support their arguments with affidavits from Japanese attorneys and impressive citations to Japanese legal authorities.

The Court is of the view that it need not decide which of these arguments is correct as a matter of Japanese law, for there is no indication in Section 5305 that the question whether a party has "voluntarily" appeared was intended to turn on the law of another jurisdiction.[5] If anything, Article 53 was meant to simplify the task of a court in determining what effect to give to the judgments of foreign courts, often

---

**4.** Professor Kulzer's study was published in the *Thirteenth Annual Report of the Judicial Conference of the State of New York* (1968) (the "Judicial Conference Report"), and appeared in substantially the same form at 18 Buff.L.Rev. 1 (1969). Unless otherwise indicated, citations herein are to the Judicial Conference Report.

**5.** Only once, in § 5302, does Article 53 call for reference to the law of the foreign country, namely for a determination of whether a foreign country judgment is final, conclusive and enforceable; any such reference to foreign law is conspicuously absent from § 5305(a)(2)'s provisions on jurisdiction.

based on legal principles vastly different from the common-law and constitutional traditions familiar to New York judges and attorneys. To introduce, even potentially, a difficult legal issue requiring the pleading and proof of the law of another jurisdiction would magnify the cost and effort required beyond reasonable bounds. While Japanese law is relevant to the jurisdictional inquiry in other ways, without some firm indication in the statute pointing the Court to the law of the foreign country, it appears eminently more reasonable to view this as a question of New York law.[6]

■ Of course, New York law also provides that a party who, after losing on a jurisdictional objection, proceeds to defend the merits, will not be deemed to have submitted to the court's jurisdiction by virtue of appearance, unless the jurisdictional objection "is not ultimately sustained". N.Y.Civ.Prac.Law & R. § 320(c)(2) (McKinney 1990). ETI argues, in effect, that in view of prevailing New York practice and the obvious intent to permit a defendant to make a special appearance in the foreign court without waiving its jurisdictional objection, *see* Judicial Conference Report at 220, it ought not be deemed to have "voluntarily" appeared at all.

■ This argument cannot be sustained. Section 320(c)(2), on which ETI relies, deals with the question of the circumstances under which an appearance, by itself, confers jurisdiction. In the larger sense, this is also the concern of Section 5305(a)(2), and if that provision attained its end by treating every voluntary appearance as conferring jurisdiction, then there would be much greater appeal to ETI's argument. However, the statute proceeds by categorizing, without defining, appearances as "voluntary" or otherwise; it then lays down the rule that, with certain exceptions, including appearances for "the purpose of ... con-

testing the jurisdiction of the court over him", a voluntary appearance will preclude the party from later challenging jurisdiction. For present purposes it is sufficient to say that, as used in Section 5305(a)(2), a "voluntary" appearance must be taken to be any appearance not under irresistible compulsion;[7] thus ETI's appearance to challenge jurisdiction should be considered "voluntary". Of course, this conclusion does not of itself preclude ETI from challenging the jurisdiction of the Tokyo Court in this action.

(C) *The Scope of the Exception for Special Appearances*

NET argues that Section 5305(a)(2)'s exception for voluntary appearances is intended to apply only where "a foreign court's assertion of jurisdiction [is] based solely upon the defendant's appearance to contest its jurisdiction." *See* Plaintiff's Reply Memorandum at 10. Although NET does not stress the point, if its argument is correct, then the exception would not apply here even without regard to ETI's presentation of a defense on the merits, since the Tokyo Court did not base its jurisdiction on ETI's special appearance.

■ As between sister states, there would be no constitutional objection to New York's adopting such a rule. The Supreme Court has held that it does not violate due process if, when a defendant makes an appearance solely to contest jurisdiction, a court asserts its jurisdiction on the basis of that appearance. *York v. Texas*, 137 U.S. 15, 11 S.Ct. 9, 34 L.Ed. 604 (1890). While this rule might well be considered "unfortunate", *see Everly Aircraft Co. v. Killian*, 414 F.2d 591, 599 n. 10 (5th Cir.1969), and, indeed, while every sister state currently refrains from exercising such jurisdiction, Restatement (Second) of Conflict of

---

**6.** Professor Kulzer noted that "[i]t is ... uncertain what effect would be given by an American court to foreign rules of res judicata with respect to findings by the court that it had jurisdiction over the defendant.... No attempt was made by the drafters [of the Uniform Act] to clarify the difficult conflict of laws questions involved.... American courts have not committed themselves to application of foreign res

judicata rules. The Act does not require such a development." *Judicial Conference Report at* 208–09.

**7.** This is not intended to narrowly construe the opposite of "voluntary" as requiring actual physical compulsion.

Laws § 33 comment e, § 81 (1969), *York v. Texas* has never been overruled.[8] *A fortiori,* once a defendant appears in a sister state for purposes of contesting that state's jurisdiction and the court finds that it has jurisdiction on some basis other than the defendant's appearance, another sister state may, consistent with constitutional principles, choose to give preclusive effect to the first state's determination of a jurisdictional question; *See* Restatement (Second) of Conflict of Laws § 81 comment 3, § 96 comment b (1969); indeed, this outcome may be constitutionally mandated. *See, e.g., Vander v. Casperson,* 12 N.Y.2d 56, 58–60, 187 N.E.2d 109, 110, 236 N.Y. S.2d 33, 34–35 (1962). *York v. Texas* involved a Texas judgment, and the jurisdictional issue did not arise in the context of a suit to enforce the judgment of another state; there might be grounds on which to distinguish *York v. Texas* from the facts before this Court. However, in a case where the defendant submits the jurisdictional question to the foreign court, and that court bases its jurisdiction on grounds other than the defendant's appearance, it could hardly be said to offend "traditional notions of fair play and substantial justice", *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945), quoting *Milliken v. Meyer,* 311 U.S. 457, 463 (1940), to hold the defendant to the foreign court's determination.

■ It is clear that Article 53 does not require that a foreign court's determination of a jurisdictional challenge be given preclusive effect in all cases where due process would so permit. A defendant who appears solely for purposes of contesting jurisdiction will not, *by such appearance,* waive any jurisdictional objection in a subsequent suit to enforce the foreign judgment.[9] It is less clear whether Article 53

allows a defendant, after having raised and lost a jurisdictional objection on grounds other than appearance, to re-litigate the jurisdictional issue in a subsequent action to enforce the foreign judgment. The language of the exception in Section 5305(a)(2) is broad enough to cover any special appearance, regardless of the basis on which the foreign court bases its jurisdiction; in such a case, the defendant would not have appeared "other than for the purpose of ... contesting the jurisdiction of the court over him." Further, as noted above, Professor Kulzer primarily analyzed this section in terms of the distinction between general and special appearances; this suggests that any special appearance would fall within the scope of the exception. It is true that in connection with the above statement, Professor Kulzer relies on discussion in the Restatement (Second) of Conflict of Laws of *York v. Texas* and the states' reaction to it; however, she nowhere indicates that the statute should be taken to refer *solely* to such situations. Rather, immediately following the passage quoted earlier, Professor Kulzer notes that

> a voluntary appearance made under the conditions described is generally regarded as binding the defendant to the court's jurisdiction over him.

Judicial Conference Report at 220.

If the exception were intended to cover only certain types of special appearances, it would have been appropriate to mention this fact here.

■ It has been said that Article 53 was intended to codify prior New York case-law;[10] although the Court is unaware of any New York cases specifically addressing the effect of a special appearance in a

---

**8.** Professor Ehrenzweig noted, however, that "some doubt may exist as to whether York v. Texas is still the law in the light of current fairness tests." A. Ehrenzweig, A Treatise on the Conflict of Laws § 27 at 90, n. 15 (1962). *But see Burnham v. Superior Court of California,* —— U.S. ——, 110 S.Ct. 2105, 109 L.Ed.2d 631 (1990) (principles developed under *International Shoe* do not apply when jurisdiction is based on presence).

**9.** This appears both from the face of the statute and from the Judicial Conference Report at 220. See also Restatement (Second) of Conflict of Laws, § 33 comment e and § 81 comment d (1969).

**10.** *See, e.g.,* Professor Siegel's *Practice Commentaries* C5301:1, N.Y.Civ.Prac.L. & R. § 5301 (McKinney 1978) at 486.

foreign court,[11] as is discussed in greater detail below, the caselaw shows a clear reluctance to blindly accept a foreign court's assertion of jurisdiction without an examination of the bases therefor. *See, e.g., Dunstan v. Higgins,* 138 N.Y. 70, 33 N.E. 729 (1893); *Martens v. Martens,* 284 N.Y. 363, 31 N.E.2d 489 (1940). At the very least, this Court is of the view that in such circumstances a New York court would look to see if the foreign court's exercise of jurisdiction comported with the requirements of due process, *Cf. Falcon Manufacturing (Scarborough) Ltd. v. Ames,* 53 Misc.2d 332, 278 N.Y.S.2d 684 (Civ.Ct. N.Y. County 1967), or if under corresponding facts a New York court would take jurisdiction, *Porisini v. Petricca,* 90 A.D.2d 949, 456 N.Y.S.2d 888 (4th Dept. 1982). As a general rule, *any* appearance in which a defendant merely challenges the jurisdiction of the foreign court should qualify under the exception found in Section 5305(a)(2), regardless of the basis on which the foreign court upholds its jurisdiction.

### D. *ETI's Defense on the Merits*

■ NET argues that by presenting a defense on the merits after losing its jurisdictional objection, ETI has made a voluntary appearance not falling within any of the exceptions described in Section 5305(a)(2). As noted above, ETI contends that Section 5305(a)(2), properly interpreted, allows a defendant to contest the merits after losing a jurisdictional challenge, and still raise the jurisdictional issue in a later suit to enforce the judgment. *See* Defendant's Memorandum in Opposition at 14–15.

The question, in the words of the statute, is whether ETI "voluntarily appeared ... other than for the purpose of ... contesting the jurisdiction of the court." NET argues that this means that a defendant

who takes *any* action in the foreign court other than challenging the court's jurisdiction falls outside the exception. The only readily apparent textual interpretation in ETI's favor focuses on the defendant's "purpose"; if a colorable claim could be made that the purpose was genuinely to contest jurisdiction—if, for example, it was procedurally necessary to address the merits in order to maintain a jurisdictional objection on appeal—arguably the exception might still apply.

ETI bases its argument on Professor Kulzer's discussion of this section, quoted above. At best, however, Professor Kulzer implies that the language should be taken to turn on the dichotomy between general and special appearances; and, while this lends support to the view that any special appearance falls within the exception of Section 5305(a)(2), Professor Kulzer's discussion as a whole implies that any defense on the merits will be treated as a general appearance, and thus deemed to be a waiver of jurisdictional objections. Of particular significance is the fact that after noting that "a voluntary appearance made under the conditions described is generally regarded as binding the defendant to the court's jurisdiction,"[12] Professor Kulzer cited to two documents: the Model Act Respecting the Recognition and Enforcement of Foreign Money–Judgments, promulgated by the International Law Association in 1964 (the "Model Act"), and Article 18 of The Preliminary Draft Convention Relating to the Jurisdiction of Courts, the Recognition and Enforcement of Decisions in Civil and Commercial Matters, and the Enforcement of Public Documents (the "Draft Convention"), subsequently ratified as the Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters, Sept. 27, 1968, 3 Common Mkt. Rep. (CCH) ¶ 6003 (the "Brussels

---

11. *Fairchild, Arabatzis & Smith v. Prometco,* 470 F.Supp. 610 (S.D.N.Y.1979), in which the court refused to permit the defendant to relitigate the jurisdiction of the British court, might be viewed as such a case; however, in that case the court specifically relied on the fact that defendant had filed an "unconditional appearance" in the British court. *Fairchild* also relied on *Bald-*

*win v. Iowa State Traveling Men's Ass'n,* 283 U.S. 522, 51 S.Ct. 517, 75 L.Ed. 1244 (1931) and its progeny; as discussed below, these cases are not controlling under New York law.

12. Judicial Conference Report at 220–21 and n. 286.

Convention"). The relevant provision of the Model Act reads as follows:

(1) For the purposes of this Act the original court has jurisdiction when:

(a) the judgment debtor has voluntarily appeared in the proceedings for the purpose of contesting the merits and not solely for the purpose of

(i) contesting the jurisdiction of the original court....

The English language version of Article 18 of the Draft Convention is of similar effect:

A court of a Contracting State before whom a defendant appears shall have jurisdiction. This rule shall not apply where appearance was entered solely to contest the jurisdiction.

In each case, the cited text unmistakably states that in order to avoid a waiver, the defendant's appearance must be "solely" for the purpose of contesting jurisdiction. Although a textual comparison might lead to a contrary conclusion, from the manner in which Professor Kulzer uses these texts, it appears inescapable that she viewed the prevailing position, and that of the Uniform Act, to be that the presentation of a defense on the merits in the foreign country court would be deemed a waiver of the jurisdictional objection by the court in which recognition of the foreign judgment was sought.

Somewhat ironically, although the phraseology of the English language version (as well as the German, Dutch, Italian and Danish texts) of Article 18 of the Brussels Convention appears to state in unmistakable terms that any act other than a jurisdictional defense will confer jurisdiction on the court, the European Court of Justice has rejected this interpretation as not "in keeping with the objectives and spirit of the Convention." [13] Similarly, the Restatement (Third) of the Foreign Relations Law of the United States takes a significantly more moderate position:

A defense of lack of jurisdiction is generally waived by any appearance by or on behalf of a person or thing ... if the appearance is for a purpose that does not include a challenge to the exercise of jurisdiction.

Restatement (Third) of the Foreign Relations Law of the United States § 421(3) (1986).

Comment g to Section 421 elaborates on this point:

In most legal systems, appearance in a proceeding ... is deemed to waive the defense of lack of jurisdiction, unless the appearance has as its purpose (or one of its purposes) a challenge to the court's jurisdiction.

*Id.* at comment g.

It would appear, then, that the apparently strict view of the effect of an appearance in the foreign court perceived by Professor Kulzer has not been borne out.

It could be argued that Professor Kulzer simply misinterpreted the Uniform Act on this point; after all, the relevant provisions of the Model Act were taken into account by the drafters of the Uniform Act,[14] and they chose wording which is somewhat less precise than the Model Act with respect to this point. This argument is unavailing. The differences in wording between the Model Act and the Uniform Act are largely explained by the availability of a model based on common-law sources.[15] Although

13. *See Elefanten Schuh GmbH v. Jacqmain* (Case 150/80) 24 June 1981, [1981] ECR 1671; CMR ¶ 8765; *Ets Rohr SA v. Ossberger* (Case 27/81) 22 October 1981, [1981] ECR 2431; CMR ¶ 8776; *W v. H* (Case 25/81) 31 March 1982, [1982] ECR 1189; CMR ¶ 8824. The European Court's action has been described as "inventing an ambiguity in the French (and Irish) texts in order to justify ignoring the complete clarity of the other texts", Lasok & Stone, Conflict of Laws in the European Community 269 (1987); it must be admitted, however, that the European Court's task was made easier by the United Kingdom's taking the position that "[a]lthough it does not seem possible to the Government of the United Kingdom to advocate an interpretation based only on the French text it nevertheless believes that the provision should be flexibly applied." *Elefanten Schuh,* [1981] ECR at 1678.

14. *See* Judicial Conference Report at 197.

15. The *Foreign Judgments (Reciprocal Enforcement) Act of 1933, 23 & 24 Geo. 5, c. 13* (the "Reciprocal Enforcement Act"). The relevant portions of the British Act read as follows: "For the purposes of this section, the courts of the country of the original court shall ... be

the Uniform Act does not contain a detailed commentary, it is clear that it was intended to codify, not to change, the common law,[16] and sources contemporaneous with the promulgation of the Uniform Act make it clear that the presentation of a defense on the merits, notwithstanding the preservation of a jurisdictional objection, was considered a general appearance. The Restatement (Second) of Conflict of Laws, which was promulgated in 1969 and which had existed in draft form for several years prior to that, describes a general appearance in this fashion:

A general appearance is one where the defendant either enters an appearance in an action without limiting the purpose for which he appears or where he asks for relief which the court may give only if it has jurisdiction over him. An appearance which falls into either of these two categories is a general appearance even though the defendant protests at the same time that he does not submit himself to the jurisdiction of the court.

A general appearance is made whenever the defendant interposes an answer or demurrer or makes a motion raising a question as to the merits of the plaintiff's claim even though the defendant shows that he does not intend thereby to submit himself to the jurisdiction of the court.

Restatement (Second) of Conflict of Laws § 33 Comment d (1969).

Further, Section 81 of the Restatement (Second) of Conflict of Laws described the effect of a special appearance in this fashion:

A state will not exercise judicial jurisdiction over an individual who appears in the action for the *sole* purpose of objection that there is no jurisdiction over him.

*Id.* at § 81 (emphasis added).

Similarly, in his treatise on conflict of laws, Professor Ehrenzweig noted that

Anyone who 'voluntarily appears, presents his case and is fully heard, . . . is thereafter concluded by the judgment of the tribunal to which he has submitted his cause' and 'precluded from collaterally attacking the judgment on the ground that the court has no jurisdiction over the defendant.'

A. Ehrenzweig, A Treatise on the Conflict of Laws § 57 at 208–09 (1962) (citations omitted).

Although Professor Ehrenzweig relied, in significant part, on *Baldwin v. Iowa State Traveling Men's Ass'n,* 283 U.S. 522, 51 S.Ct. 517, 75 L.Ed. 1244 (1931), for the above statement, it is clear from the context that the discussion deals with the recognition of judgments of foreign countries as well as those of sister states. *Id.* at 206.[17]

It is clear from the above that the prevailing view at the time the Uniform Act was drafted was that for these purposes, any presentation on the merits would warrant the conclusion that a defendant had appeared generally, and that this would

deemed to have had jurisdiction (a) in the case of a judgment given in an action in personam (i) if the judgment debtor, being a defendant in the original court, submitted to the jurisdiction of that court by voluntarily appearing in the proceedings otherwise than for the purpose of . . . contesting the jurisdiction of that court." The Court is unaware of any cases construing this particular passage; however, British cases recognize that the Reciprocal Enforcement Act, on the whole, "reflects the common law position;" *Henry v. Geoprosco International Ltd.* [1976] Q.B. 726, 751; *see also Societe Cooperative Sidmetal v. Titan International Ltd.* [1966] 1 Q.B. 828, 847; and under common law, both before and after the enactment of the Reciprocal Enforcement Act, British courts have strictly interpreted the principle that any act other than an appearance to contest jurisdiction will be deemed a submission to the court's jurisdiction. *See Henry v. Geoprosco International Ltd.* [1976] Q.B. 726; *Harris v. Taylor* [1915] 2 K.B. 580; *see also In re Dulles' Settlement* (No. 2) [1951] Ch. 842, 850.

16. Commissioners' Prefatory Note, Uniform Foreign Money Judgments Recognition Act, 9B U.L.A. 64 (1966).

17. See also E. Scoles, Handbook of the Conflict of Laws, § 72 at 114, § 73(5) at 121 (1964) ("Consent to the jurisdiction may be conferred after an action has been begun. . . . The defendant makes a general appearance. It is clear that he is before the court and is bound by the judgment rendered. The same is true where he raises questions which involve the merits of the action").

preclude the defendant from mounting a subsequent collateral attack on jurisdictional grounds. Thus, although Section 5 of the Uniform Act did not refer to general and special appearances, these traditional distinctions are part of the conceptual underpinnings of that section; whether the New York legislature wished to follow the intent of the drafters of the Uniform Act, or wished Professor Kulzer's views to be authoritative, the result is the same.

Professor Siegel's commentary accompanying Article 53 reaches substantially the same conclusion:

> [The jurisdictional exception applies] where the appearance was solely to protest jurisdiction.... If the judgment debtor did any more than he had to do, however, to preserve his jurisdictional objection in the foreign court, he would thereby have submitted voluntarily to its jurisdiction and forfeited the right to claim an exception [under this section].

D. Siegel, *Practice Commentaries* C5301:1, N.Y.Civ.Prac.Law & R. § 5305 (McKinney's 1978) at 496–97.

Conceivably, this could be read to mean that if the foreign country would refuse to hear a jurisdictional appeal unless a defendant first presented a defense on the merits, then the defendant had not done 'any more than he had to do' by arguing the merits. No such argument has been presented here, however; as far as it appears, ETI could have defaulted on the merits and still appealed the Tokyo Court's ruling on jurisdiction,[18] and it apparently is reserving its right to appeal on the merits as well.[19]

The Court is of the view that Section 5305(a)(2) was intended to preclude a defendant in ETI's position from relitigating the issue of jurisdiction. In some ways, this is an unsatisfying conclusion. The objection to the rule of *York v. Texas* is that it may "work serious hardship on a defendant" by "forc[ing] him to run the risk of surrendering" either a jurisdictional defense or a defense on the merits, and it was just this hardship that Section 5305(a)(2) seeks to avoid. Restatement (Second) of Conflict of Laws § 81 Comment a (1969). Arguably, the outcome described above avoids this result. If a defendant genuinely has no significant contacts with a particular forum, then it can challenge jurisdiction there and, if unsuccessful at that stage, safely default on the merits; presumably, the judgment will be meaningless in the foreign country, since the defendant has no assets there, and such a judgment will not be enforced in New York. On the other hand, if the defendant's relationship with the foreign country is such that a default in the foreign country would seriously affect its assets or business relationships, then it is probable that a New York court would find that the foreign court properly took jurisdiction; in either case, the defendant, knowing all the facts, is in the best position to determine whether its contacts with the foreign country are sufficient to support jurisdiction and warrant a defense on the merits.

The difficulty with this interpretation is that it does not take into account the effect that will be given the foreign country judgment in other foreign countries. By way of example, the Brussels Convention, to which each member of the European Community is a party, generally requires each contracting state to recognize the judgments of the other contracting states (Article 26), and prohibits, with few exceptions, the state in which recognition is sought from inquiring into the jurisdiction of the

---

**18.** See Declaration of Tetsuro Toriumi, ¶ 8 ("Pursuant to Japanese law, a party who unsuccessfully objects to the court's personal jurisdiction over it is taken to preserve its objection, *and any subsequent appearance, as a matter of law, is not in any way considered to be a voluntary submission to the court's jurisdiction*") (emphasis added). Thus, ETI's own expert on Japanese law does not appear to distinguish cases in which a defendant defends on the merits from those in which, having lost a jurisdictional challenge in the first instance, the defendant simply appeals the jurisdictional issue without addressing the merits.

**19.** See Declaration of Tetsuro Toriumi, ¶ 9 ("While ETI has not yet fully formulated its positions or prepared briefs in this appeal, prime grounds for the appeal will be the court's ruling on jurisdiction over ETI and the requirement of litigating in Japan").

state in which the judgment was rendered (Article 28). In addition, although as between domiciliaries of any of the contracting states, the various "exorbitant" bases of jurisdiction, *see generally* Kulzer, Some Aspects of Enforceability of Foreign Judgments: A Comparative Summary, 16 Buff. L.Rev. 84, 118 (1966–67), available under member states' laws do not apply, such jurisdictional bases are available against non-domiciliaries. So, for example, if a defendant domiciled in New York and having substantial assets in England were to be sued in France by a French plaintiff, Article 14 of the French Civil Code would permit the French court to take jurisdiction on the basis of the plaintiff's nationality. Under these circumstances, a special appearance to contest jurisdiction would be futile, and the defendant would face the choice of defending on the merits, in which case an adverse judgment would be enforceable in New York, or defaulting on the merits, in which case the judgment would be enforceable in England. Such a result is at least as harsh as the outcome which the statute seeks to avoid; but there is no indication that it was taken into account by the drafters of the Uniform Act or by the New York Legislature.[20]

However, it is not for this Court to second-guess the New York Legislature, and it does not appear that any comparable claim of extreme and unavoidable hardship can be made on the facts of this case. Although it may have been inconvenient for ETI to litigate in Japan, the nature of the freight forwarding business requires that whenever litigation arises, at least one of the parties will have to travel. In view of the background of the Uniform Act as adopted by the New York Legislature, and given the current state of the record, it appears that ETI will be precluded from challenging the jurisdiction of the Tokyo Court; as a result, barring a reversal on appeal in Japan, it is probable that NET will ultimately prevail in this action.

**20.** It is clear from her discussion of the Uniform Act that Professor Kulzer was well aware of the

### (E) *Common–Law Approaches*

Even if it were possible to conclude that Section 5305(a)(2) does not preclude ETI from challenging the jurisdiction of the Tokyo Court, Section 5305(b) makes it clear that a New York court may recognize a judgment based on grounds other than those articulated in Article 53. NET argues that under New York common law, ETI would be precluded from relitigating the question of jurisdiction. Although the Court takes a different view of New York's common-law tradition, it readily concludes, on the present state of the record, that jurisdiction could properly have been asserted in Japan, albeit not on the grounds articulated by the Tokyo Court.

### (1) *Recognition of Foreign Judgments at Common Law*

As a general matter, New York courts have long maintained a strong policy of giving preclusive effect to foreign country judgments. *Dunstan v. Higgins*, 138 N.Y. 70, 33 N.E. 729 (1893); indeed, at a time when the leading Supreme Court case, *Hilton v. Guyot*, 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895), conditioned recognition of a foreign judgment on reciprocity, the New York Court of Appeals rejected such a limitation. *Johnston v. Compagnie Generale Transatlantique*, 242 N.Y. 381, 152 N.E. 121 (1926). Early leading cases often cited "comity" as the basis for recognition of foreign judgments; *see, e.g. Dunstan*, 138 N.Y. at 75, 33 N.E. at 730; later caselaw has tended to weaken the notion of comity, instead relying on the "persuasiveness" of the foreign judgment. *See Johnston*, 242 N.Y. at 387, 152 N.E. at 123, *Cowans v. Ticonderoga Pulp & Paper Co.*, 219 A.D. 120, 219 N.Y.S. 284, *aff'd*, 246 N.Y. 603, 159 N.E. 669 (1927); Judicial Conference Report at 198–99. It would appear that in this context, "persuasiveness" should be taken to refer more to the fairness of the process than the correspondence with the result which would obtain in the state where recognition is sought. *Johnston*,

Draft Convention, which contained all of the above-cited provisions.

242 N.Y. at 387, 152 N.E. at 123.[21] While commentators have argued that "comity" is a concept devoid of content, *see, e.g.,* Smit, International Res Judicata and Collateral Estoppel in the United States, 9 U.C.L. A.L.Rev. 44, 53 (1962), and that the same principles underlying the doctrine of *res judicata* are or should be the driving force behind recognition of foreign judgments, *see, e.g.* Judicial Conference Report at 198–99 (1968); Reese, The Status in this Country of Judgments Rendered Abroad, 50 Colum.L.Rev. 783, 784–85 (1950),[22] comity is still cited in the cases as the basis of recognition of foreign judgments. *See, e.g. Greschler v. Greschler,* 51 N.Y.2d 368, 414 N.E.2d 694, 434 N.Y.S.2d 194 (1980).

Early leading cases such as *Dunstan, Johnston* and *Cowans* might be read to the contrary, but more recent caselaw specifically incorporates a limitation on the preclusive effect of foreign judgments drawn from cases governed by the Full Faith and Credit Clause, to the effect that a foreign country judgment will not be given any greater preclusive effect in a New York court than it would in the country where it was rendered. *Schoenbrod v. Siegler,* 20 N.Y.2d 403, 230 N.E.2d 638, 283 N.Y.S.2d 881 (1967) (foreign judgments); *Compare Farmland Dairies v. Barber,* 65 N.Y.2d 51, 478 N.E.2d 1314, 489 N.Y.S.2d 713 (1985) (sister-state judgments). Thus, if a foreign country would permit a collateral attack on its own judgment, a New York court will do the same. *Schoenbrod,* 20 N.Y.2d at 885, 230 N.E.2d at 641, 283 N.Y. S.2d at 885. This position is consistent with that of the Restatement (Second) of Conflict of Laws § 95 comment g (1969).[23]

#### (2) *Limited Recognition of Jurisdictional Decisions*

Notwithstanding New York's general rule favoring preclusive effect, courts have consistently recognized that under certain conditions, a foreign country judgment will be accorded significantly less weight than a sister-state judgment. *See, e.g. Schoenbrod,* 20 N.Y.2d at 409 n. 3, 230 N.E.2d at 641, 283 N.Y.S.2d at 885; *Rosenbaum v. Rosenbaum,* 309 N.Y. 371, 376, 130 N.E.2d 902, 904 (1955); *Ramm v. Ramm,* 34 A.D.2d 667, 310 N.Y.S.2d 111 (1970), *Martens v. Martens,* 284 N.Y. 363, 31 N.E.2d 489 (1940).[24] And it is clear, even in the earliest caselaw, that the determination of a foreign court as to jurisdiction is to be treated with circumspection. Thus in *Dunstan,* the Court of Appeals noted that a judgment "upon the merits" was conclusive, but could be impeached by "proof that the court in which it was rendered had not jurisdiction ... of the person of the defendant." 138 N.Y. at 74, 33 N.E. at 730. At the least, New York courts will readily reexamine jurisdictional issues in cases where the foreign judgment was entered on a default, *Plugmay Ltd. v. National Dynamics Corp.,* 53 Misc.2d 451, 278 N.Y.S.2d 896 (N.Y.App.Term), *aff'd,* 28 A.D.2d 645, 282 N.Y.S.2d 172 (1st Dept. 1967); *Falcon Mfg. (Scarborough) Ltd. v. Ames,* 53 Misc.2d 332, 278 N.Y.S.2d 684 (N.Y.City Civ.Ct.1967), and they may be willing to do so in other cases as well, *Martens v. Martens,* 284 N.Y. 363, 31 N.E.2d 489 (1940).[25]

**21.** "When the whole of the facts appear to have been inquired into by the French courts, judicially, honestly and with full jurisdiction and with the intention to arrive at the right conclusion, and when they have heard the facts and come to a conclusion, it should no longer be open to the party ... to ask the American court *to sit as a court of appeal from that which gave the judgment." Id.*

**22.** Professor Smit has advocated a more complicated approach which would take into account the nature of the action and a variety of individual circumstances to determine, on a case-by-case basis, whether it would be fair to preclude a party from relitigating issues raised in a foreign action. *See Smit, supra* at 62.

**23.** A judgment is not deemed "conclusive" within the meaning of Section 5302 if it is subject to collateral attack. NET asserts that the Japanese Judgment is conclusive, and ETI has not challenged this assertion; thus the Court assumes that the Tokyo Court's decision as to jurisdiction, although appealable, is not subject to collateral attack in Japan.

**24.** It could be argued that since the cases cited all involved divorces, they should not be given general applicability. However, note 3 in the *Schoenbrod* opinion—albeit *dictum*—does not readily lend itself to such a limiting interpretation.

**25.** In *Martens,* defendant moved to dismiss a divorce action on the ground that a German divorce decree was conclusive of all issues between the parties. Although the Court of Ap-

New York courts have not always been willing to recognize judgments based on foreign countries' long-arm statutes, even when the facts would have supported jurisdiction under New York's long-arm statute, N.Y.Civ.Prac.Law & R. § 302 (McKinney 1990). Thus in *Siedler v. Jacobson*, 86 Misc.2d 1010, 383 N.Y.S.2d 833 (1st Dept. 1976), a case interpreting Article 53, the court noted that

> "it was not within the intendment of that statute to adopt the broad definition of 'transacting any business' applicable under CPLR 302 as the criterion for extending recognition to foreign country judgments themselves bottomed on correspondingly liberal bases of jurisdiction."

86 Misc.2d at 1010–11, 383 N.Y.S.2d at 834.[26]

More recently, in *Porisini v. Petricca*, 90 A.D.2d 949, 456 N.Y.S.2d 888 (4th Dept. 1982), the court asserted that "New York may, and appropriately should, recognize a foreign judgment predicated on any jurisdictional basis it recognizes in its internal law." 90 A.D.2d at 950, 456 N.Y.S.2d at 890. Whether a New York court would recognize a judgment in a case where New York law would not authorize personal jurisdiction but where the requirements of due process were satisfied remains to be seen.

NET argues that cases such as *Vander v. Casperson*, 12 N.Y.2d 56, 58–60, 187 N.E.2d 109, 110, 236 N.Y.S.2d 33, 34–35 (1962), and *Dieter v. Dieter*, 84 A.D.2d 677, 446 N.Y.S.2d 630 (4th Dept.1981), aff'd, 56 N.Y.2d 578, 450 N.Y.S.2d 187, 435 N.E.2d 404 (1982) demonstrate that, unlike the case of default judgments, where a defendant litigates the question of jurisdiction in the foreign court, New York's common-law principles require that the decision of that court will be given preclusive effect. These cases, however, involved judgments rendered by Florida and Texas, respectively; the result in any such case will usually be dictated by the Full Faith and Credit Clause, unless the state rendering the judgment has unusual principles regarding the *res judicata* effect of its judgments. This by no means leads to the conclusion that foreign country judgments should be given the same treatment. In the case of sister-state judgments, a New York court can

peals did not provide much discussion of the facts, it is clear from the opinion below that neither party lived in Germany at the time the decree issued, "or at any time thereafter". The plaintiff in the New York action asserted that the German court lacked personal jurisdiction; the opinions do not reveal whether the plaintiff had defaulted in Germany. Without limiting its comments to cases of default judgment, the Court of Appeals stated that "[i]n order to pass upon the question as to whether a judgment of a court of a foreign country is to be recognized, there must be a disclosure of the jurisdiction of the foreign court of the subject matter and of the parties. The acts of the parties to the foreign litigation in invoking the jurisdiction must also sometimes be scrutinized. This can best be done at a trial where the court has all the facts before it and can determine under established rules the question of recognition or non-recognition of the judgment of the foreign court." 284 N.Y. at 365–66, 31 N.E.2d 489. In an appropriate case, this will not preclude a determination of jurisdictional questions on summary judgment. *See Falcon Mfg. (Scarborough) Ltd. v. Ames*, 53 Misc.2d at 336, 278 N.Y.S.2d at 688.

**26.** A pre-Article 53 case, *Falcon Manufacturing (Scarborough) Ltd. v. Ames*, 53 Misc.2d 332, 278 N.Y.S.2d 684 (N.Y.City Civ.Ct.1967), had also refused recognition of a Canadian judgment where the Canadian court's jurisdiction was

based on a long-arm statute, holding that since the undisputed facts revealed that the defendant had "absolutely no contact with" Canada, due process required that recognition be denied. However, although the court in *Ames* declined to reach the issue, the facts suggested that the requirements of the Canadian long-arm statute might not have been met; in view of this, and the court's conclusion that under corresponding facts a New York court would not itself have jurisdiction, *Ames* cannot be said to demonstrate an unwillingness to accord foreign courts the same degree of liberality in taking jurisdiction as New York courts allow themselves.

It is unclear whether *Plugmay Limited v. National Dynamics Corp.*, 53 Misc.2d 451, 278 N.Y.S.2d 896 (1st Dept.1967) stands for such a proposition. In that case, the court below had strongly intimated that a New York court should judge a foreign court's assertion of jurisdiction by the same liberal standards available to it under Section 302 of the C.P.L.R.; 48 Misc.2d 913, 916–17, 266 N.Y.S.2d 240, 243–44 (N.Y.City Civ.Ct.1966); on appeal, the case was reversed on the grounds that "issues of fact as well as of law were presented which prevented . . . the granting of summary judgment. There must be a full disclosure of the jurisdiction of the foreign court. . . ." *Id.* The appellate panel provided no discussion of the legal standard by which the British court's jurisdiction was to be judged.

safely assume that minimum requirements of due process have been met, or that the defendant has foregone an opportunity to raise the issue. No such comparable assurances are available with regard to the judgment of a foreign country, particularly if the legal system of the country in question is not within the common-law tradition. Nor are the federal cases cited by NET controlling, as a matter of New York law. *Baldwin v. Iowa State Men's Travelling Ass'n*, 283 U.S. 522, 525–26, 51 S.Ct. 517, 517–18, 75 L.Ed. 1244 (1931) held, in essence, that within the federal system, one court will treat the jurisdictional findings of another court as *res judicata.* And while *Sprague & Rhodes Commodity Corp. v. Instituto Mexicano Del Cafe*, 566 F.2d 861 (2d Cir.1977), held that a defendant who entered a special appearance in a Mexican court had no right to mount a collateral attack on the Mexican court's jurisdiction, its stated authority for this proposition was *Baldwin*, and the question at issue in that case was one of federal law. *Sprague & Rhodes* did not purport to base its holding on New York law, which is controlling here. Similarly, in *Fairchild, Arabatzis & Smith, Inc. v. Prometco (Product & Metals) Co., Ltd.*, 470 F.Supp. 610 (S.D.N.Y.1979), the court held that the plaintiff, having litigated and lost the jurisdictional question in the foreign court, could not relitigate the issue; as authority, it cited *Baldwin, Sprague & Rhodes*, and *Vander v. Casperson.* Unlike the federal cases cited above, New York courts have consistently distinguished between judgments of sister states, which must be accorded full faith and credit as a matter of constitutional law, and judgments of foreign countries, for which full faith and credit is not constitutionally mandated. *See, e.g., Schoenbrod v. Siegler*, 20 N.Y.2d 403, 409 n. 3, 230 N.E.2d 638, 641, 283 N.Y.S.2d 881, 885 (1967). The Court is of the view that a New York court would not view *Baldwin* or cases relying on it as controlling under the circumstances presented here.

While it appears that neither Article 53 nor New York's common-law principles of recognition would prevent a court from re-examining a foreign court's determination of a jurisdictional issue, in appropriate circumstances such an examination might be cabined within narrow limits. The Restatement (Third) of the Foreign Relations Law of the United States suggests an approach which takes into account both the grounds of the foreign court's jurisdiction and the nature of the determination made by the foreign court:

> If the defendant appeared in the foreign court to challenge the jurisdiction of the court and failed to prevail, it is not clear whether such determination will be considered *res judicata* by a court in the United States asked to recognize the resulting judgment. If the determination of jurisdiction depended on a finding of fact to support an otherwise unobjectionable basis of jurisdiction—for example, whether X was an agent through whom the defendant did business in the forum state—the determination after contest ordinarily will be respected.... If the determination depended on a question of law or a mixed law/fact question—for example, whether a nonresident corporation is present in the forum state by virtue of having an "alter ego" subsidiary there—the court asked to recognize the resulting judgment will scrutinize the jurisdictional determination on its merits.... If the judgment of the foreign court is founded on a basis of jurisdiction not meeting the standards of § 421—for instance, the plaintiff's nationality under Article 14 of the French Civil Code—but another basis of jurisdiction would have supported the action—for instance, that the action grew out of an activity of the defendant conducted in the territory of the forum, § 421(i), a court in the United States may recognize and enforce the judgment.

Restatement (Third) of the Foreign Relations Law of the United States § 482 comment c (1986).

The Court is of the view that such an approach would generally be consistent with the goals of New York's statutory and common law principles of recognition, and that a New York court, faced with this

issue, would be likely to follow this approach.[27]

### (3) The Tokyo Court's Jurisdictional Ruling

■ The Tokyo Court based its assertion of jurisdiction on two factors: first, it found that ETI's duty to remit payments to NET constituted an obligation which was to be performed in Japan; second, it found that ETI had an affiliate in Japan, from which it received assistance in pursuing the lawsuit. The questions of the "place of performance" of ETI's obligation to make payments and the relationship between ETI and its Japanese affiliate are, at best, mixed questions of fact and law. Under these circumstances, the approach outlined above would require a court to look behind the judgment to see if the facts supported the exercise of jurisdiction.

It is clear that neither of the bases of jurisdiction articulated by the Tokyo Court would support jurisdiction under New York law. With regard to ETI's duty to remit payments to NET, New York courts have rejected attempts to uphold jurisdiction on such grounds. *See, e.g., Waldorf Associates, Inc. v. Neville,* 141 Misc.2d 150, 533 N.Y.S.2d 182, *aff'd,* 155 A.D.2d 283, 547 N.Y.S.2d 556 (1st Dept.1989); *see also Falcon Mfg. (Scarborough) Ltd. v. Ames,* 53 Misc.2d 332, 278 N.Y.S.2d 684 (N.Y.City Civ.Ct.1967) (New York defendant who failed to make payment to Canadian plaintiff held to have "absolutely no contact with Canada"). With regard to ETI's relationship with Emo Japan Ltd. ("EJL"), New York courts will generally permit the exercise of jurisdiction on the basis of the presence of an affiliate under two circumstances: first, by piercing the corporate veil, *see, e.g., Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.,* 751 F.2d 117 (2d Cir.1984), and second, by finding an agency relationship, broadly defined, *see, e.g., Frummer v. Hilton Hotels International, Inc.,* 19 N.Y.2d 533, 227 N.E.2d 851, 281 N.Y.S.2d 41, cert. denied, 389 U.S. 923, 88 S.Ct. 241, 19 L.Ed.2d 266 (1967); *Gelfand v. Tanner Motor Tours, Ltd.,* 385 F.2d 116 (1967), cert. denied, 390 U.S. 996, 88 S.Ct. 1198, 20 L.Ed.2d 95 (1968); *see generally* J. McLaughlin, *Practice Commentaries* C301:3, N.Y.Civ.Prac.Law & R. § 301 (McKinney 1990). In this case, it is clear that the lack of "nearly identical ownership interests", *Volkswagenwerk Aktiengesellschaft,* 751 F.2d at 120, between ETI and EJL would make it inappropriate to attempt to pierce the corporate veil.[28] Further, the mere presence of an affiliated entity in Japan would not be sufficient under New York law subject ETI to jurisdiction; there would need to be some showing that EJL had acted in a representative capacity on ETI's behalf prior to the commencement of suit.[29]

■ Simply because the articulated bases of jurisdiction would have been deemed insufficient under New York law does not lead to the conclusion that the Tokyo Court improperly asserted jurisdiction, however; if ETI's contacts with Japan were sufficiently well-developed to support jurisdiction, there would be little reason to deny recognition to the Japanese Judgment just because the Tokyo Court's stated rationale differed from that which a New York court would follow. In this case, uncontested

---

27. For other cases in which New York courts have shown a receptivity to evolving developments in the theory and practice of jurisdiction and conflict of laws, see *Schoenbrod v. Siegler; Porisini v. Petricca,* 90 A.D.2d 949, 456 N.Y.S.2d 888 (4th Dept.1982).

28. From the briefs and affidavits, it appears that a majority of ETI is owned by the Friggers family, with a minority interest held by a Swiss entity, Emo Trans AG Swiss, which in turn is majority owned and controlled by one E. Moltman. Emo Trans AG Swiss also owns a majority of EJL; it does not appear from the papers who else holds an interest in EJL.

29. *See, e.g., Delagi v. Volkswagenwerk AG of Wolfsburg, Germany,* 29 N.Y.2d 426, 278 N.E.2d 895, 328 N.Y.S.2d 653 (1972). *See generally* J. McLaughlin, *Practice Commentaries* C301:3, N.Y.Civ.Prac.L. & R. § 301 (McKinney's 1972 at 6–13 & 1990 Supp. at 6). Under New York law, an agent may not, by its own actions, subject its principal to jurisdiction. *Haar v. Armendaris Corp.,* 31 N.Y.2d 1040, 294 N.E.2d 855, 342 N.Y. S.2d 70 (1973); Weinstein, Korn & Miller, *New York Civil Practice* ¶ 301.16 at 3–43. In this case, however, NET may rely on the acts of EJL, which is not a party in the Japanese Action.

facts readily lead to the conclusion that, judged by the standards of New York and federal constitutional law, jurisdiction could properly have been asserted in Japan.

### (4) *Jurisdiction Under New York Law*

■ New York's general jurisdictional statute, Section 301 of the Civil Practice Law & Rules, N.Y.Civ.Prac.Law & R. § 301 (McKinney's 1972), incorporates all bases of jurisdiction recognized at common law. Of cardinal importance at common law and under Section 301 is jurisdiction based on a finding that a foreign corporation is doing business within the state; so long as a corporation does business "not occasionally or casually, but with a fair measure of permanence and continuity," *Tauza Susquehanna Coal Co.,* 220 N.Y. 259, 267, 115 N.E. 915 (1917), then it is deemed to be "present" within the state, and subject to suit on any cause of action, not merely those arising out of business transacted in the state. *Id.* New York courts have not attempted to formulate a precise definition of "doing business"; rather, the determination should be "simple and pragmatic", *Bryant v. Finnish National Airline,* 15 N.Y.2d 426, 432, 208 N.E.2d 439, 441, 260 N.Y.S.2d 625, 629 (1965), turning on the facts of the case. *Sterling Novelty Corp. v. Frank & Hirsch Distr. Co.,* 299 N.Y. 208, 210–11, 86 N.E.2d 564, 565 (1949). One of the traditional indicia of "doing business" is "substantial, regular and continuous sales or shipment of goods in the state." 1 J. Weinstein, H. Korn & A. Miller, *New York Civil Practice* ¶ 301.16 at 3–34 (1989). In *Tauza* itself, the Court relied both on defendant's having an office in the state and in having "obtain[ed] orders which result in continuous shipments ... to New York"; 220 N.Y. at 265, 115 N.E. at 917; there is reason to believe, however, that substantial and continuous shipments alone would have been a sufficient basis for jurisdiction.[30]

A foreign corporation may also be found to be doing business in the state by virtue of the actions of an in-state agent taken on the defendant's behalf. It is clear from the caselaw that in this context, the term "agent" may at times include a person who, under common law, would more readily have been considered an "independent contractor" than an "agent". *See, e.g., Gelfand v. Tanner Motor Tours, Ltd.,* 385 F.2d 116 (2d Cir.1967), *cert. denied,* 390 U.S. 996, 88 S.Ct. 1198, 20 L.Ed.2d 95 (1968). In general, it appears that New York courts will find an agency relationship for purposes of Section 301 if the services performed "are sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services", *Gelfand,* 385 F.2d at 121, and if the representative is genuinely acting on behalf of the foreign corporation, and not for its own account.[31] In some instances, common ownership may give rise to an inference of agency, *Frummer v. Hilton Hotels International, Inc.,* 19 N.Y.2d 533, 227 N.E.2d 851, 281 N.Y.S.2d 41, *cert. denied,* 389 U.S. 923, 88 S.Ct. 241, 19 L.Ed.2d 266 (1967), although it is neither necessary, *Gelfand,* 385 F.2d 116, nor sufficient, *Mayer v. Josiah Wedgwood & Sons, Ltd.,* 601

**30.** As noted in J. Weinstein, H. Korn & A. Miller, *op. cit.,* "In *Tauza* Judge Cardozo cited approvingly the case of *International Harvester Co. v. Kentucky,* 234 U.S. 579, 34 S.Ct. 944, 58 L.Ed. 1479 (1914), in which the defendant was found to be doing business upon continuous shipment of goods into the forum, even though defendant had no place of business there". *Id.,* 3–34, n. 105.

**31.** *See, e.g. Delagi v. Volkswagenwerk, AG,* 29 N.Y.2d 426, 278 N.E.2d 895, 328 N.Y.S.2d 653 (1972). In that case, the Court of Appeals noted particularly the absence of affiliation between the defendant ("VWAG") or its American subsidiary ("VWoA") and the purported agent ("World–Wide"); the Court went on to say that "World–Wide was 'related to VWoA only by way of a Distributor Agreement.' Under this agreement, World–Wide purchases Volkswagen automobiles and parts outright from VWoA, takes possession at dock in Newark, N.J., and resells same to local Volkswagen dealers in its franchise area.... Where, as here, there exists truly separate corporate entities, not commonly owned, a valid inference of agency cannot be sustained." 29 N.Y.2d at 431, 328 N.Y.S.2d 653, 278 N.E.2d 895. *See also McShan v. Omega Louis Brandt et Frere, S.A.,* 536 F.2d 516 (2d Cir.1976); Weinstein, Korn & Miller, New York Civil Practice ¶ 301.16 at 3–41.

F.Supp. 1523, 1529 n. 5 (S.D.N.Y.1985). In connection with actions on behalf of the foreign corporation, it has been said that the agent must have the power to bind the foreign corporation. While such a test may have particular significance in the context of sales of services such as use of hotel rooms, *Frummer,* or the sale of tour tickets, *Gelfand,* it would appear appropriate to look to the nature of the enterprise to determine those actions which can most reliably indicate whether an entity is acting on behalf of the defendant or on its own account.

ETI's business, by its nature, involves the performance and brokering of transportation services. Insofar as the Court understands the business, the freight forwarder typically will enter into a contract with a customer for the delivery of a quantity of goods to a separate country; the forwarder will then assemble goods into quantities suitable for shipment, arrange to have the goods transported by carrier, and engage another party on the other end to receive the shipment, break it down, and deliver (or arrange for delivery of) the goods to the ultimate recipient.

Since 1986, ETI has maintained a relationship with EJL whereby EJL would act as break bulk agent for shipments originated by ETI to Japan; ETI derives approximately 1% of its gross revenues—about $600,000 per year—from its shipments to Japan. Between 1982 and 1986, ETI had had a similar arrangement with NET; the president of ETI had been a director of NET, and he had travelled to Japan to help solicit business for both NET and ETI. Whether ETI's president engages in such activities with EJL is not revealed in the record.

There can be no question but that the value of shipments sent by ETI to Japan is "substantial". ETI argues that the amount in question constitutes an insignificant portion of its gross revenues. While that may be so, this cannot be the only appropriate measure of substantiality; if ETI's argument were accepted, then the larger the foreign corporation, the less likely would it be to be amenable to suit in New York.[32] In this context, the "substantiality" requirement is satisfied by the gross value of business transacted by ETI in Japan, in excess of half a million dollars annually.[33] Further, ETI has engaged in "continuous" activity directed at Japan, as evidenced by its maintaining relationships first with NET and then with EJL, over a period of eight years. Thus, even apart from considerations of ETI's relationship with EJL, it could be said that ETI had directed its activity at Japan with a "fair measure of permanence and continuity."

██ In addition, it can hardly be argued that EJL is not ETI's "agent", performing actions on ETI's behalf in Japan. The Court notes that ETI itself characterizes EJL as its "break bulk agent". *See Frigger Declaration,* ¶ 19. To paraphrase the *Gelfand* Court, it must be conceded that since the nature of ETI's business is getting the goods to their ultimate destination, the services performed for it by EJL "are sufficiently important to [ETI] that if it did not have [EJL or some other representative] to perform them, [ETI's] own officials would undertake to perform substantially similar services". *Gelfand,* 385 F.2d at 121. Further, so far as it appears from the record, no argument can be made that in serving as break bulk agent, EJL is really acting on its own account. There is no indication in the record that EJL enters

---

**32.** *Compare Allen v. Canadian General Elec. Co., Ltd.,* 65 A.D.2d 39, 410 N.Y.S.2d 707 (3rd Dept. 1978), *aff'd,* 50 N.Y.2d 935, 431 N.Y.S.2d 526, 409 N.E.2d 998 (1980), in which the Appellate Division rejected the argument that the term "substantial revenue" as used in Section 302(a)(3)(i) was subject to a similar percentage limitation: "To *limit* the issue of jurisdiction in all cases to a comparison of the ratio of sales in individual states to total sales would, in all probability, insulate a large corporation, such as

defendant, from possible liability in most individual states of the union. Such should not be the rule or judicial interpretation based on the present record." *Id.,* 65 A.D.2d at 43, 410 N.Y. S.2d at 709 (emphasis in original).

**33.** By comparison, in *Gelfand,* the "agent" booked roughly $120,000 per year for the defendant; this amounted to about ³⁄₇ of the value of one particular tour.

into a separate contract with the party who initially shipped the goods, or that its profits for shipment are independent of ETI's. In addition, ETI relies *solely* on EJL for break bulk services in Japan. *See Caballero Spanish Media, Inc. v. Betacom, Inc.,* 592 F.Supp. 1093 (S.D.N.Y.1984); *compare Marantis v. Dolphin Aviation, Inc.,* 453 F.Supp. 803 (S.D.N.Y.1978); thus, in the words of the New York Court of Appeals, EJL does "all the business which [ETI] could do were it here by its own officials." *Frummer,* 19 N.Y.2d at 537, 227 N.E.2d at 854, 281 N.Y.S.2d at 44. In the presence of facts such as these, it is significant that ETI and EJL are affiliated through common ownership and that ETI acts as EJL's break bulk agent in the United States. While certain of the characteristics of a common law agency relationship may not be present here, that is not the test under Section 301; given the nature of the freight forwarding business and the services performed by EJL, the Court is of the view that EJL is ETI's agent, within the meaning of Section 301, and that actions taken by EJL on ETI's behalf are attributable to ETI for purposes of determining whether ETI is "doing business" in Japan.

In view of the volume and continuity of activity initiated by ETI and directed toward Japan, the Court concludes that, were it necessary to reexamine the facts to determine whether ETI is amenable to suit in Japan, it would find that, judged by the standards of Section 301, a New York court would conclude that ETI was doing business in Japan on a substantial, continuous and permanent basis, and that as a result the Tokyo Court could properly have asserted jurisdiction over it. In consequence, whether under Section 5305(a)(2) or under common law, NET has demonstrated a probability of success on the question of the Tokyo Court's jurisdiction, and thus on the merits of this action.

THE NEED TO CONTINUE THE ATTACHMENT

 It remains to be seen whether NET has demonstrated a need to continue the

levy, as required by Sections 6212(a) and 6223(b) of the New York Civil Practice Law & Rules, N.Y.Civ.Prac.Law & R. §§ 6212(a), 6223(b) (McKinney 1980). NET mounts two arguments here. First, it asserts that in cases where the defendant is already a judgment creditor by virtue of the decision of a fair and impartial foreign tribunal, nothing more need be shown to justify an attachment than the existence of the foreign judgment and the fact that it remains unsatisfied. Second, it argues that ETI, as a judgment debtor, has a strong incentive to conceal its assets, that it has made no effort to satisfy the judgment, has refused to post alternate security, and has, by its own admission, transferred assets to third parties since the Japanese Judgment was entered. The Court concludes that although NET is not required to meet the stringent standards of Section 6201(3), it must nonetheless make some showing that confirmation of the attachment is necessary to secure the judgment; in view of the discretionary nature of attachment under Article 62, *see* 7A J. Weinstein, H. Korn & A. Miller, *New York Civil Practice* ¶ 6201.03 (1988),[34] and because the Court concludes that NET has failed to demonstrate any need to continue the attachment, the motion to confirm must be denied.

Article 62's provisions for attachment are designed to serve two basic purposes: acquiring jurisdiction over the defendant and making provision, where necessary, to secure any judgment which plaintiff eventually recovers. *See, e.g.,* 7 N.Y.Jud.Council Rep. 391–92 (1941); Report of the Judicial Conference of the State of New York to the 1977 Legislature, Leg.Doc. (1978) No. 90 at 251–52; *Maitrejean v. Levon Properties Corp.,* 45 A.D.2d 1020, 358 N.Y. S.2d 203 (2d Dept.1974); *Zeiberg v. Robosonics, Inc.,* 43 Misc.2d 134, 250 N.Y.S.2d 368 (1964); *Elliott v. Great Atlantic & Pacific Tea Co.,* 11 Misc.2d 133, 171 N.Y. S.2d 217 (N.Y.City Ct.1957), *aff'd,* 11 Misc.2d 136, 179 N.Y.S.2d 127 (N.Y.Sup. 1958); *see generally* 7A J. Weinstein, H.

---

**34.** "Even if the plaintiff's cause of action clearly fall within one of the classes of actions in which attachment is available, the plaintiff is never entitled to an order as a matter of right". *Id.*

Korn & A. Miller, New York Civil Practice ¶¶ 6201.01, 6223.16 (1988); J. McLaughlin, *Practice Commentaries* C6201:1, N.Y.Civ. Prac.Law & R. § 6201, at 11 (McKinney 1980). In this case, ETI, as a New York corporation, is subject to the jurisdiction of the Court; thus an attachment would appear to be warranted only if there is a need to secure the judgment NET hopes to obtain in this Court.

NET recognizes, as it must, that the weight of New York caselaw strongly supports this position. *See, e.g., Reading & Bates Corp. v. National Iranian Oil Co.,* 478 F.Supp. 724, 726–27 (S.D.N.Y.1979).[35] It argues, however, that this case and all other cases cited by ETI deal with *pre-judgment* attachments, and that in post-judgment cases the showing of an unsatisfied foreign judgment is sufficient. To require anything further, NET asserts, would create "the anomalous result that the standard for granting the attachment ... would be radically different from the standard for confirming it," and would "make CPLR § 6201(4) entirely redundant of CPLR § 6201(3), which entitles *any* plaintiff, *before* obtaining a judgment, to an attachment on [a showing of concealment of assets]."

It is true, as NET asserts, that the standard for confirming an attachment is the same as that for granting an *ex parte* order of attachment in the first instance. *See Report of the Judicial Conference of the State of New York to the 1977 Legislature,* Leg.Doc. (1978) No. 90, at 260. It is also true that Section 6201(4) does not explicitly require a showing of a need to secure the judgment, much less impose on the party seeking attachment the heavy burden of showing that the opposing party has concealed assets with intent to defraud creditors, or is about to do so, as is required by Section 6201(3). It does not follow, however, that an attachment should be granted or confirmed in cases where it is manifestly unnecessary to obtain jurisdiction or to ensure enforcement of whatever judgment ultimately issues.

The fact that Section 6201(4) does not explicitly require a showing of need to maintain security is not conclusive. Section 6201(1), which authorizes attachment against foreign corporations, is likewise silent on this issue; however, the Appellate Division in *Maitrejean v. Levon Properties Corp.,* 45 A.D.2d 1020, 358 N.Y.S.2d 203 (2d Dept.1974), held that in the absence of either a need to obtain jurisdiction or to secure a judgment, Section 6201(4) would not justify an attachment.[36] In addition, there is no indication that the 1970 amendment which authorized attachment on the basis of a foreign judgment was intended to expand the purposes traditionally served by Article 62; on the contrary, the report of the Judicial Conference accompanying the legislation indicated that

[t]he amendment enables a plaintiff suing on a judgment rendered in a ... foreign country to take advantage of the jurisdictional as well as the security purpose of an attachment.[37]

---

**35.** The Court in *Reading & Bates* noted that an attachment should be confirmed "only upon a showing that drastic action is required for security purposes". *Id.* at 726–27.

**36.** In *Maitrejean,* the Appellate Division noted that "this drastic remedy is not necessary here for either jurisdictional ... or security purposes.... The attachment remedy being discretionary, we hold that Special Term improvidently exercised its discretion in granting attachment of Curtiss–Wright's property on these facts." *Id.,* 45 A.D.2d at 1020, 358 N.Y.S.2d at 205. At the time, Subsection 6201(1) authorized attachment against foreign corporations regardless of whether they were qualified to do business in the state.

**37.** The report goes on to say "even though defendant is a resident of the state and none of the qualifying circumstances specified in CPLR 6201 are present." The Court does not take this to mean that the showing of need for security is irrelevant under Section 6201(4). Rather, it appears to refer to the wide variety of qualifying circumstances then contained in Section 6201. For example, Section 6201(2) authorizes attachment against residents of the state in cases where such residents cannot be personally served; at the time in question, Section 6201(3) authorized attachment against defendants, resident or not, who had departed the state to defraud creditors or avoid service of process. In addition, Section 6201(5) permitted attachment when the defendant had been guilty of fraud in the past, and Sections 6201(6) and (8) referred to actions involving conversion, fraud or deceit.

*Report of the Judicial Conference of the State of New York to the 1970 Legislature,* Leg.Doc. (1971) No. 90, at 36.

Further, notwithstanding NET's assertion that the caselaw only requires a showing of continuing need for security in *pre-judgment* cases, it is unable to point to a single case supporting this position, and the Court has been unable to find any case drawing this distinction. It could be argued that the legislative history of the 1977 amendments to Article 62 support NET's interpretation of Section 6201(4). These amendments were developed as a response to the district court's ruling in *Sugar v. Curtis Circulation Company,* 383 F.Supp. 643 (S.D.N.Y.1974), *rev'd sub nom. Carey v. Sugar,* 425 U.S. 73, 96 S.Ct. 1208, 47 L.Ed.2d 587 (1976), which had held New York's attachment statute unconstitutional. As part of a general reworking of the statute, the Legislature deleted certain provisions which had authorized attachment on the basis of the nature of the action. In proposing these amendments, the Judicial Conference had noted that

> [t]he present statute, in authorizing attachment in these cases, apparently indulges in the unproven presumption that defendants charged with the stated wrongs are more likely to indulge in conduct frustrating the enforcement of a future judgment in plaintiff's favor than defendants in other cases. The provisions are of dubious constitutional validity. There is no reason why a defendant charged, for example, with conversion is more likely to tamper with his property than one sued for assault, wrongful death or negligence. In the absence of compelling reasons, drastic interference with the free use and enjoyment of defendant's property should not be authorized on the basis of limited judicial cognition, long before defendant has his full day in court and his liability has been established.
>
> Paragraph 7 would be renumbered paragraph 4, but would otherwise remain as it presently reads, because attachment should be available to secure judgments entitled to full faith and credit or qualifying for registration [sic] under Article 53.

These are situations sui generis where the defendant had his day in court, or at least an opportunity for a day in court, although the court was foreign rather than domestic.

*Report of the Judicial Conference of the State of New York to the 1977 Legislature,* Leg.Doc. (1978) No. 90, at 251–52.

Although this passage makes it clear that attachments based on foreign judgments are properly viewed as different from pre-judgment attachments, taken as a whole, it indicates that (i) the 1977 amendments were not intended to change or expand the purposes served by Section 6201(4), (ii) that section was singled out for special treatment because of a perceived need to secure the judgment plaintiff hopes to obtain, and (iii) attachment, while "available", is and remains a discretionary remedy. At bottom, the 1977 amendments, as well as the Judicial Conference's comments, were addressed to the constitutionality of Article 62. There is no indication that the amendments were intended to transform attachment into a remedy available as of right; however, if NET's argument were accepted, this would necessarily be the result, because even in cases where it was manifestly unnecessary, there would be no statutorily relevant basis on which a court could deny an attachment.

The Court is of the view that in cases where jurisdiction is not at issue, the standard under Section 6201(4) requires that the plaintiff make some showing of a need to secure the sought-after judgment, both at the time an attachment is sought *ex parte* and on the motion to confirm, albeit a lesser showing than would be required under Section 6201(3). Read in this fashion, Section 6201(4) is not redundant of Section 6201(3). In addition, the role of the Court on the motion to confirm is not merely a rubber-stamping of its earlier decision to permit an attachment; when the motion is contested or when the plaintiff has had the opportunity to conduct expedited discovery, the factual setting is likely to be much better developed, *see Report of the Judicial Conference of the State of New York to the 1977 Legislature,* Leg.Doc.

(1978) No. 90, at 260,[38] and a different outcome may well be warranted. In the words of a leading commentator, "when the attachment is not necessary for security purposes, the defendant is entitled to a vacatur"; *see* 7A J. Weinstein, H. Korn & A. Miller, *New York Civil Practice* ¶ 6223.16 (1988).

If there were any doubt as to this conclusion, the Court notes that ETI has moved, pursuant to N.Y.Civ.Prac.Law & Rules § 6223(a), to vacate the attachment. That section provides that "[i]f, after the defendant has appeared in the action, the court determines that the attachment is unnecessary to the security of the plaintiff, it shall vacate the order of attachment;" NET has not suggested that this provision is inapplicable in this case, and there is no basis in the statute, legislative history or caselaw to reach such a conclusion.

■ Thus the question for the Court is not merely whether there exists a foreign judgment, likely to merit recognition, and remaining unsatisfied; rather, it is whether NET has shown that confirmation is necessary to secure payment of the Japanese Judgment. The Court concludes it has not. It must be conceded that if ETI's statements regarding its revenues and assets are credited, ETI would have no difficulty satisfying the Japanese Judgment. NET has not presented the Court with any information which tends to cast doubt on ETI's assertions, although it bears the burden of proof on this issue and has had the opportunity to conduct limited discovery. Similarly, in view of the nature and history of ETI's business, it appears unlikely that it would attempt to "flee" the jurisdiction. As to ETI's program of restructuring its operations in some states in order to give key personnel equity interests in majority-owned subsidiaries, NET claims that this amounts to a transfer of assets to third parties. While this may be true, ETI's explanation of the purpose of its restructuring program is a plausible one, and its effect is limited by operation of law; absent stringent supermajority provisions not normally used for such subsidiaries, ETI, as the majority shareholder, would have effective control over the funds and other assets of its subsidiaries.

The Court concludes that NET has not met its burden of proof regarding the need to continue the attachment; as a result, the motion to confirm is DENIED, and the order of this Court dated February 2, 1990, granting such attachment, is vacated subject to the conditions described in the following section.

STAY PENDING APPEAL IN JAPAN

■ Notwithstanding the vacatur of the order of attachment, in the absence of a stay NET would be able to move for summary judgment on its claim for recognition of the Japanese Judgment; in view of the discussion of the jurisdiction of the Tokyo Court above, it appears likely that, absent compelling new evidence, summary judgment would be granted in NET's favor, and it could enforce that judgment immediately. If, subsequently, ETI were to prevail on its appeal in Japan, in whole or in part, the soundness of this Court's judgment would be called into question. The parties have advised the Court that it may well take a year or more before the appeal process is exhausted in Japan. On NET's behalf, it must be recognized that this is a considerable time to wait, without security, for a judgment which under Article 53 might be granted and enforced forthwith. If ETI had any assets in Japan, the only way it could fend off enforcement pending appeal would be to post a bond; and while this Court does not sit as a court of appeal from the Japanese Judgment, the same policy of requiring a bond in order to postpone enforcement is reflected in New York law, *see* N.Y.Civ.Prac.Law & R. § 5519(a)(2) (McKinney 1978), and in the Federal Rules, *see* Fed.R.Civ.P. 62(d). In view of these competing considerations, the Court views it appropriate to order a stay

---

**38.** "Where the court grants an order of attachment before a hearing, or where the defendant has defaulted, the court must apply these standards on the basis of the papers and proofs presented by the plaintiff. In other instances there will usually be opposing papers and proofs presented by the defendant." *Id.*

of these proceedings, subject to the following conditions:

FIRST, the stay shall take effect only upon ETI's posting a bond for the full amount of the Japanese Judgment, plus a reasonable reserve to cover interest for an eighteen-month period; ETI may, in its discretion, post such bond in this Court or in the appropriate court in Japan; and

SECOND, in order to avoid creating any incentive for 'strategic behavior' on ETI's part, the effective time of the vacatur of this Court's order of attachment shall be postponed until such time as ETI posts the bond described above.

NET requests, in addition, that if a stay is granted, ETI should be precluded, upon completion of the appeals process in Japan, from raising any further defenses before this Court. ETI has raised additional defenses in its answer which are not relevant to the motion to confirm but which would be relevant to a motion for summary judgment. To predetermine, before briefings or submission of affidavits, that ETI could not raise any other defenses available to it under Article 53 would be inappropriate.

Subject to the conditions described herein, (i) the motion for an order confirming the attachment is DENIED, and (ii) the proceedings in this action are hereby STAYED pending the outcome of ETI's appeal of the Japanese Judgment.

SO ORDERED.